# Richard Tittermary and Robert Tittermary, for the use of their assignees *against* John Gardiner, junr.

Demurrage on a charter party rests on the default of the freighter or his factor abroad.
The claim of freight is determined by a capture of the vessel and breaking up the voyage.

COVENANT on a charter party of affreightment, made on the 20th April 1799. Plea, covenants performed, with leave &c., and a notice of a set-off.

The charter party was of the schooner John, captain Matthew Ford, from the port of Philadelphia to Surinam, and back again. The entire freight stipulated to be paid was $2920, and for demurrage beyond 20 days at Surinam, at the rate of $20 per diem. A special *nota bene* was subjoined, that if the cargo, or any part of it, should be taken out of the vessel, by any of the belligerent powers, their subjects, or citizens, the goods remaining on board should only be subject to freight.

The cargo was consigned to James R. M'Corkle at Surinam, who was ordered to sell the same, and ship a return cargo. It appeared by two protests of the captain, that he sailed from Philadelphia on the 3d May 1799, and on the 14th June in sight of land, he fell in with a French armed sloop, called the Importune of Cayenne, who plundered her of the greater part of her cargo, and left on board merchandise to the amount of $506 and 75 cents. Two of the crew only were permitted to remain on board the schooner ; the captain and the rest of the crew were put into a long boat, and arrived at Surinam, without papers or letters. The schooner also arrived there on 21st June, without

[Tittermary v. Gardiner.]

a register, or other papers, having been plundered thereof by the privateer. The captain informed M'Corkle, that the schooner's cargo was consigned to him, and desired him to furnish him with a loading back to Philadelphia. M'Corkle swore, that he refused to do this, as he had received no instructions for that purpose ; and that the captain had applied also to one Henry Anderson, to freight him back, who likewise refused. That in conversation with captain Ford, he had advised him as a friend, and in no other character, to sell the vessel and cargo for the benefit of those concerned. The schooner was sold accordingly at auction to Beninger and Co. for 1150 guilders, and the remnant of the cargo being on board, Ford directed them to sell the same at auction, which was also done, and an account current was afterwards furnished. M'Corkle purchased the schooner back from Beninger and Co. for the defendant ; but told Ford he would let the plaintiffs *have her back, if they would [*158 repay all his expences, provided their outward voyage was not insured. The delay of the schooner at Surinam arose from different causes, the state of the place which the British forces took possession of on the 22d August, the want of a cargo on freight, and the want of a convoy. M'Corkle obtained a special permission for her to depart. The return cargo was put on board under bills of lading. One Lawrence, of New York, on the 30th August 1799, shipped 42 bales of cotton at $5 per bale freight ; and M'Corkle shipped 82 hogsheads of sugar on the 16th September following, at $8 per hogshead freight, consigned to the defendant. M'Corkle further swore, that he knew nothing of the existence of the charter party ; and that he had no design or intention in the friendly communications he had with Ford to nullify or affect the same in any shape.

Captain Ford, in a deposition taken under a rule of court, swore to the facts contained in his two protests, and that the vessel was delivered up to him at Surinam on the 24th June, and that she was ready to receive her return cargo on board on the 13th July, but was detained by M'Corkle until the British took possession of the place, and that after having obtained permission to depart, he waited until October for convoy. He believed that the object of M'Corkle was to break the charter party by a sale of the vessel.

It appeared that the defendant had insured his outward cargo, and on receiving information of the loss, had on the 16th July abandoned to the underwriters. The loss was estimated at $7209 and 44 cents, and was afterwards settled at the rate of $86 and 70 cents per cent.

The defendant gave in evidence by way of set-off, two notes from the plaintiff to him, dated 12th November 1792, the one for $1047 and 3 cents, payable in 3 months after date, and the 2d for $1052 and 28 cents in 4 months.

Mr. M. Levy for the plaintiff, claimed $1240, the demurrage

of the schooner in Surinam, for 62 days from 16th July to 16th September ; and $1460, the one half of the freight in the charter party, on the return cargo.

The plaintiffs claim no demurrage, while the vessel waited for convoy ; but they deem themselves intitled thereto after the 20 days were expired, until the sugars were shipped on board. Where the correspondent does not load the vessel on her homeward voyage upon the day agreed on, the master may return empty, or obtain another cargo ; but if he stays, the usual freight only shall be paid, and a compensation be made in the nature of demurrage to the owners.   Abbot 158, Lond. ed. Jamieson and Co. v. Laurie.   In Dom. Proc. 10th November 1796.

*159]   *If the agent abroad cannot, or will not put anything on board, after the master has laid the days agreed on by the charter party, the owner shall be paid his freight, empty for full.   Beaw. Lex. Mercat. 121, 4th ed.

The ship is also entitled to the homeward freight, that is, one half of the entire freight stipulated to be paid.   The want of the register and other sea papers was no ground of objection, why the consignee did not furnish an early return freight.   If a vessel be stripped of her credentials of character, either by accident or force, she is not liable to confiscation.   1 Rob. Admiralty Cases 100. Lond. ed. 84, 85. American ed.   The conduct of M'Corkle is very extraordinary, when contrasted with the deposition of Ford.   Why was the schooner sold at Surinam, except to complicate the business ?   Why was she detained from July to September, except as the captain swears, to break the charter party ?   The sale of the vessel by the captain was the effect of coercion by the consignee, who on no other terms, would allow any part of the return cargo to be put on board.   But she has performed her return voyage, and is therefore entitled to the homeward freight, according to the terms of the charter party.   The East India Company might by charter party keep a ship they had freighted for a long time in India, and did so keep her, until she was unfit to return home ; though by the charter party the freight was payable on her return, yet the company was decreed to pay the damage.   2 Vern. 210.   The case of Westland v. Robinson was therein cited by the Lord Chancellor. Ib. 212.   Where no freight was to be paid for the cargo outwards, but freight homewards, and the factor abroad had no goods to lade her homewards, the payment of the freight was decreed.   A vessel taken by the enemy and retaken, and not otherwise incapacitated, she may proceed after restitution, and the whole freight will be due.   2 Burr. 886.   In case of a loss at sea, freight must be paid in proportion to the goods saved, or the part of the voyage which was performed.   Ib. 889.   A ship is freighted, and she receives her lading, an embargo happens and the lading is taken as forfeited, yet the owners shall receive

[Tittermary *v.* Gardiner.]

freight ; for here is no fault in them, but only in the merchants. 1 Mol. lib. 2. c. 1, § 12. 9th ed. 316.

Messrs. Ingersoll and Watts for the defendant, contended, that the capture vacated the charter party. Here there was a total loss, and the voyage was wholly broken up. No freight therefore could be due, and of course no demurrage. The goods were to be transported to Surinam, and there delivered to M'Corkle. The outward cargo was to be there sold, in order to form a fund for the purchase of the return cargo. But the schooner was taken during her voyage, and stripped of the greater *part of her cargo, as well as all her papers and letters. Hereby the plaintiffs lose their freight. 6 T. [*160 R. 482. The consignee received no instructions from the defendant to furnish a cargo back ; he could not with any degree of prudence, rely on the verbal information of the master, whom he never saw before ; and if even this information could have been relied on, the small remnant of the outward cargo would have been inadequate to purchase another freight. The plaintiffs have been guilty of an oversight in not insuring their freight, which they might well have done. 8 T. R. 362. 6 T. R. 478.

There is no presumption of collusion between the intended consignee and the master. The former gave him the best advice he could, under existing circumstances. Beninger and co. sold what remained unplundered of the cargo, at auction. By the terms of the charter party, demurrage is only to be paid for the default of the freighters ; here was no default in them. It is not contended, that the defendant should pay the freight of the outward cargo. The law, independent of the special note at the foot of the instrument, would secure him against such a demand. And no reason can be assigned, why the freight specified in the charter party, should be paid on the inward cargo, when the bills of lading signed by the captain, ascertain the special agreement of the parties for freight, during that voyage. In all the cases cited by the plaintiff, the outward cargoes were delivered ; and here the charter party directs, that the freight shall be paid on the delivery of the homeward cargo. It is a sufficient defence, that the voyage was not performed according to the agreement of the parties. Abbot 258. 7 T. R. 381.

The court submitted to the jury, whether there was the smallest ground to infer collusion between the consignee and the captain, or coercion on the part of the former as to the latter. M'Corkle had no means of knowing that the return freight stipulated for, was less than that agreed upon in the charter party. It could not be expected, that he should receive the agency without written instructions from the defendant.

Here was no default in the defendant, or his factor, to entitle the plaintiffs to demurrage. The claim of freight under the charter party was avoided by the capture of the vessel, and plundering her of more than ⅞ of her cargo. The voyage was

thereby defeated and a total loss accrued. The defendant abandoned to the underwriters, and having made his cession to them, he had no further concern in the cargo. The claim for the homeward freight rested solely on the bills of lading.

The jury certified in favour of the defendant $1700.03, as due to him.